**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 1:24-cr-00178 (RBW)** |
| | : | |
| **MATTHEW VALENTIN,** | : | **18 U.S.C. §111(a)(1)** |
| | : | **(Assaulting, Resisting, or Impeding** |
| **Defendant.** | : | **Certain Officers)** |

**DEFENDANT MATTHEW VALENTIN'S**
**MEMORANDUM IN AID OF SENTENCING**

COMES NOW, Matthew Valentin, Defendant above, by and through his legal counsel, Joshua E. Karoly, Esquire, and submits the following memorandum in aid of the sentencing scheduled in this matter for January 17, 2025.

**I.    Procedural History**

On September 12, 2024, the United States Attorney filed a two-count Second Superseding Information charging Defendant Matthew Valentin with Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Counts One and Two). The Second Superseding Information does not provide notice to the Defendant that the Government intends to seek forfeiture as part of the sentence. The criminal conduct charged in the Second Superseding Information occurred on or about January 6, 2021, as to each count.

On September 26, 2024, the Defendant pled guilty to both counts of the Second Superseding Information, pursuant to a written plea agreement and Rule 11(c)(1)(B). The charges arise out of the Defendant's participation in some of the events surrounding the U.S. Capitol building on January 6, 2021.

## II.    Sentencing Guideline Range

The Defendant agrees with the guideline calculation of a total offense level of 19, a Criminal History Category I, and a Guideline range of 30 to 37 months as set forth within the Presentence Report. However, the Defendant respectfully asserts that this range overstates the culpable conduct actually committed by the Defendant and, consequently, in keeping with the requirements of Section 3553(a) of the U.S.S.G. (that the Court shall impose a sentence which is "sufficient but not greater than necessary" to effect justice), the Defendant is requesting a downward variance, which is addressed is more fully, *infra*.

## III.    The Applicable Sentencing Standard

Following the Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738 (2005), a sentencing court must impose a sentence after giving meaningful consideration to the factors contained in 18 U.S.C. § 3553(a). *United States v. Cooper,* 437 F.3d 324, 329 (3d Cir. 2006).  The Sentencing Guidelines that were once mandatory are now advisory and the properly calculated sentencing guideline range is now **but one factor** in the Court's sentencing determination.  The Third Circuit is off cited for the concise way it has articulated the steps that the sentencing court must go through at sentencing.

> A district court must begin the process by first calculating the applicable Guidelines range.  After that initial calculation, the court must then rule on any motions for departure and, if a motion is granted, state how the departure affects the Guidelines calculation. Finally, after allowing the parties an opportunity for argument, the court must consider all of the § 3553(a) factors and determine the appropriate sentence to impose, which may vary from the sentencing range called for by the Guidelines.

*United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009).

Section 3553(a) mandates that a district court must "impose a sentence sufficient but not greater than necessary" to comply with the purpose of sentencing set forth in 18 U.S.C. § 3553(a)(2).

The Third Circuit, as with other Circuit Courts, has interpreted the statute as requiring the imposition of a sentence which is "minimally sufficient" to achieve the stated purposes of sentencing. *United States v. Serafini*, 233 F.3d 758, 776 (3d Cir. 2000). *See also United States v. Tucker*, 473 F.3d 556,561 (4th Cir. 2007); *United States v. Forman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006). The purposes of sentencing include the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner". 18 U.S.C. § 3553(a)(2)(A), (B), (C) and (D).

The courts must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the kinds of sentences available"; the now, non-mandatory Sentencing Guidelines; and "the need to provide restitution to any victims of the offense". 18 U.S.C. § 3553(a)(1), (3), (4) and (7).

## IV.    **Requested Variance**

The Defendant seeks a "downward variance", that is, a lower than the calculated recommended Guidelines range based upon the statutory factors outlined in 18 U.S.C. § 3553(a). See, *U.S. v. Tomko*, 562 F. 3d 558 at n.3 (3d Cir. 2009) (en banc). The Supreme Court made the Guidelines advisory in *U.S. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005) and thereby permitted judges to grant "variances" from the Guidelines without the limitations formally placed on "departures". Accordingly, a court may choose to rely upon the departure methodology provided by § 4A1.3, but it is not required to do so. Instead, the court may simply "vary" from the Guidelines based upon the defendant's sentencing factors. ("*Booker* variance").

The Defendant's current Guidelines range calls for 30 to 37 months of imprisonment, even where

the Defendant has led an otherwise crime free, law-abiding exemplary life. Without a downward variance, the Defendant will be punished for a Class D Felony which does not provide this Court with any of the non-incarceration alternatives otherwise reasonably available to this Court, to effect individualized justice in this case. More importantly, without a downward variance, the Defendant will be punished as severely as other defendants whose much more serious conduct more clearly approximates what Congress and the Sentencing Commission had in mind for those who commit Aggravated Assault with a weapon and/or inflict serious bodily harm upon a law enforcement officer (U.S.S.G Section 2A2.2(a).

Fortunately, to effect justice, the law permits this Court in any given case to impose a downward variance where, in its sole discretion, it deems appropriate. That is what the Defendant respectfully requests here based upon the following.

## V.    The Requirements of Section 3553(a)

### A.    The Nature And Circumstances Of The Offense

The "beating heart" of any sentencing is the Defendant's actual conduct which gave rise to the offenses for which he is being sentenced. The Court's job is then, to determine what the Defendant did, or did not do, in furtherance of his criminal transgressions and, in accordance with the rule guiding all sentencing, to then determine what sentence it should impose that is "sufficient but not greater than necessary" to comply with the purpose of sentencing set as set forth in 18 U.S.C. §3553(a)(2). Accordingly, the Court must analyze "the nature and circumstances of the offense." §3553(a)(1).

Defendants Matthew and Andrew Valentin are two of the roughly 1,500 Defendants who have thus far been charged with participating in the January 6, 2021 "riots" or "civil unrest", whereat hundreds of citizens advanced on the Capitol in an effort to either protest, or to directly interfere

with, the 1:00 p.m. convening of a joint session of Congress to count the votes of the Electoral College, and to certify the results of the 2020 Presidential election.

However, the joint certification session had to be suspended one hour later when, at approximately 2:00 p.m., a large crowd that had gathered outside the Capitol building began to breach it, placing the Congressional participants, and others at risk. The House and the Senate, including its President, Vice President Pence, evacuated the chambers by approximately 2:20 p.m. See, Statement of Offense, para. 7.

The Defendants Valentin were <u>not</u> among those persons who breached the Capitol Building, or any other building, and they never went beyond the Capitol grounds, at any time.

The conduct which forms the basis of the Defendant's guilty plea to 18 U.S.C. Section 111(a)(1) is agreed-to in the Statement Of Offense, as follows:

> 14.  The defendant knowingly and voluntarily admits to all the elements as set forth above. Specifically, the defendant admits that he voluntarily, intentionally, and forcibly, assaulted a U.S. Capitol Police Officer at approximately 2:29 PM on January 6, 2021. The defendant further admits that he intentionally used a metal barricade, during the assault. The defendant also admits that the U.S. Capitol Police Officer was an officer of the United States who was then engaged in the performance of his official duties.
>
> 15.  The Defendant admits that he voluntarily, intentionally and forcibly, assaulted a Metropolitan Police Officer at approximately 3:30 PM on January 6, 2021. The defendant further admits that he grabbed a Metropolitan Police Officer's baton during the assault. The defendant also admits that the Metropolitan Police Officer was assisting officers of the United States who were engaged in the performance of their official duties.

Statement Of Offense, para. 14-15.

At sentencing, the Defendant is, of course, permitted to set forth factors which mitigate against the above two offenses of assaulting members of law enforcement.

The Defendant believes that the surcharges overstate the seriousness of the conduct which Congress intended to criminalize by adopting 18 U.S.C. Section 111(a)(1). Specifically, there are

three (3) instances that are the gravamen of the Defendant's conduct on January 6th. First, the actions of the Defendant utilizing the bike rack barricade to push into a line of officers protecting the Capitol. The Defendant engaged in only a several second pushing and pulling episode with the metal barricade into the line of officers who were formed on the other side. Thankfully, no officer was injured because of the Defendant's conduct with the barricade. The barricade was never lifted overhead in any manner or swung at the officers as a weapon, but rather pushed into the officers. The barricade was also not an object which the Defendant brought with him to the Capitol. It simply was a bike rack that was strategically placed to serve as a barricade, which then was utilized when the Defendant wrongfully shoved it into a line of officers as the officers attempted to (rightfully) prevent the further advance of protestors toward the Capitol. Further, while Matthew was pushing the bike rack into the line of officers his hand slipped through the bars and contacted an officer on the other side of the barricade. Matthew's hand contacted the officer for a second before he immediately removed his hand. This action was not an attempt to strike or choke the Officer, and again, thankfully that officer was not injured by Matthew's criminal conduct. The still frame of the moment Matthew's hand slipped through the barricade may give the impression of a more significant touching, but the video evidence only supports a momentary touching which did not cause harm.

In the case of the "chemical spray incident", which was not charged, Matthew released the spray, which he also did not bring with him to the Capitol, in an area where law enforcement was located, but did not directly spray any officer, nor was any officer struck with the spray or suffer any harm as a result of the spray.

And finally, as to the "baton grab". The Defendant wrongly advanced on a line of officers who were courageously protecting the Capitol, but the baton grab occurred as the baton was being swung in the Defendant's direction. After the Defendant grabbed the baton, he did not, at any time,

6

attempt to harm any officer with the subject baton.

Counsel's pointing out of these subtle facts is not an attempt to excuse the clearly criminal conduct Matthew engaged in but rather are stated for the purpose of the Court's consideration in determining potential mitigation as compared to other much more severe assaultive behavior engaged in on that day. In the greater context of January 6th, the Defendant seeks to point out to this Court what, importantly, Matthew did not do.

1. He did not physically harm any other person.

2. He did not enter, nor attempt to enter, any building.

3. He did not damage any property.

4. He surrendered all his communications and social media for review, all of which indicate that he did not glorify his illegal acts.

5. He did not go to the Capitol as a member of any group or organization for the purpose of engaging in a physical conflict.

6. He did not blame President Donald Trump for his own independent acts but instead has always taken personal responsibility for them.

7. And, the Defendant did not declare himself innocent of any unlawful act which he engaged in but, instead, he timely admitted to his criminal transgressions by entering a plea of guilty to the offenses presently before this Court and is timely appearing for sentencing.

### B.    The History and Characteristics of the Defendant

Section 3553(a)(1) also requires that a sentencing court examine the history and characteristics of each defendant that appears before it to impose a sentence that balances the offense with the other relevant factors. The Supreme Court has recognized that "it has been 'uniform and

constant in the federal judicial tradition' for the sentencing judge to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate . . . the crime and punishment to ensue." *United States v. Koon*, 518 U.S. §81, 113 (1996). We respectfully ask for the same consideration from this Court.

The seriousness of this matter has not been lost on Mr. Valentin, as he has stated to anyone who will listen, that he is deeply sorry and recognizes the great impact his criminal misconduct has had, and will have, on his daughter and his family, and the officers who were putting themselves at great risk to defend both the Capitol and our Democracy.

### The History of the Defendant

Matthew Valentin is a 32-year-old father of a three-year-old daughter, who resides with him and her mother, 33-year-old Amanda Mohammed, his partner of six years, in a small home in Stroudsburg, Pennsylvania. Matthew runs his own HVAC business, MV Heating and Cooling, LLC, out of his home.

Mathew has supportive parents, ages 62 and 53, who have been married for over 40 years, and who also reside in Stroudsburg. As do two of his four brothers, Andrew, age 27 and Nicholas, age 21. The older two brothers, Josh, age 25 and Ivan, age 40 live in New York. The whole family is very close, religious, and hard working. In fact, Matthew includes foremost as one of his favored hobbies, attending church and singing in the choir.

Matthew had what he calls a "blessed" childhood, of modest financial means. Matthew graduated from the local high school in 2010 and received an associate's degree in HVAC and business, with a 3.3 GPA in his final semester, and was on the Dean's List in the Fall of 2014. He has consistently worked for other companies doing HVAC, plumbing and electrical work since the time of his graduation. And, after he secured an Environmental Protection Agency (EPA) license

and an HVAC license, he opened his own company where he is the sole employee with the exception of an occasional unpaid intern whom he mentors. The Defendant's ability to speak conversational Spanish, often aids in this task.

The Defendant supports his family from his HVAC business, which he has spent many years building through hard work, customer-by-customer, and his reputation is based upon month-to-month referrals. Obviously, significant incarceration would destroy his one-man business, and he would lose what he has built. He also fears that, given the fact that the business is what allowed him to develop a cash flow that supported his family, without it his family would struggle.

The disastrous impact that incarceration would obviously have on his family's finances is not the Defendant's only fear. His three-year-old daughter is truly a "Daddy's Girl" and is very attached to him. A large part of the Defendant's decision to work from home centered around his ability to maintain the closeness he shares with his daughter during her play times and mealtimes, and during their reading and singing sessions. To suddenly remove him from her life, especially during her most formative years, would be disastrous and would represent a collateral punishment (albeit of the Defendant's own making) which she does not deserve, and a consequence which, in good conscience and with legal justification, this Court can determine to avoid, or mitigate.

### The Character Of The Defendant

As stated, the Defendant has been law-abiding for his entire life. During that same time, he has been a productive and caring member of his community who has contributed his free time to church and church-related activities (where he also sings in the choir and plays drums). From 2019 to 2020, the Defendant traveled to New Zealand to raise money, as part of a charity, to find a cure for diabetes. Living there, he biked the entire country to raise awareness for juvenile diabetes, a cause close to his heart, due to a family history of the disease.

His family and friends have described him in glowing, but honest terms, as a wonderful young man, with a big heart, who works hard, has always shown compassion for others, has never been on the wrong side of the law and, who has a history of respecting both law enforcement and the government. His conduct on January 6th was his first known overtly political act and protest in his life. His conduct on January 6th remains as much a mystery to his friends and family as it still does to the Defendant himself. See Exhibit "A".

Finally, and perhaps most importantly, the remorse and regret that Matthew has expressed since his serious January 6th misadventure is patent and is nowhere more comprehensively and genuinely expressed than in his interview with probation office in this case, which the Court has reviewed as a portion of his presentence report and therefore will not be repeated here.

In short, it is not beyond the bounds of advocacy to say that this legal representative has had only a handful of cases that compare in his 18 years of the practice of criminal law where a Defendant's misconduct has been more out of character, or more sincerely regretted, than in the instant case. Matthew is the son, brother, father and friend most people would envy, and want to have. His past law-abiding, giving and compassionate life renders such a desire understandable. It reminds one of the great maxim: "Of what good is a man's reputation if it cannot aid him in his hour of need?"

Matthew has a well-deserved reputation for being a good man. This is his "hour of need". This Court has "seen it all", "heard it all" and has "been there before." Only the most discerning of such jurists will look beyond the fog of January 6th, to see who Matthew really is and what justice in this case ought to look like.

**C.**    **The Need For Sentence Imposed To Reflect The Seriousness Of The Offense**

It is well established in expert circles that respect for the law is damaged among the public to the greatest degree when excessive sentences are imposed. "Excessive Punishment", by the Equal Justice Initiative. See also, "Countering Excessive Punishment With Chances For Redemption", Josh Wardel, Brennan Center For Justice, February 4, 2022; "Across the Country Harsh Sentencing Laws are Tearing Apart Families and Communities, ACLU, Nicole Zayas Fortier and Kimberly Buddin-Crawford, December 24, 2019; "The Second Look Movement: A Review of the Nation's Sentence Review Laws," Becky Feldman, May 15, 2024 (The Sentencing Project); "Excessive Sentencing Project – Pennsylvania," National Association of Criminal Defense Attorneys, October 16, 2014.

Matthew needs to face punishment. Yes, his criminal conduct was serious. But as stated herein, Matthew's sentence should be tailored to his conduct and not conduct attributable to other serious wrongdoers which occurred on January 6th.

**D.      <u>Promote Respect for the Law</u>**

The Supreme Court observed in *Gall* that: "a sentence of imprisonment may work to promote not respect, but derision, of the law, if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quoting with approval the reasoning of the District Court); see also *United States v. Deegan*, 605 F.3d 625, 655 (8th Cir. 2010) (Bright, J., dissenting) (observing that harsh <u>federal</u> punishment when compared to lenient <u>state</u> sentencing for the same criminal activity "promotes disrespect for the law and the judicial system."); *United States v. Ontiveros*, 07–CR–333, 2008 WL 2937539, at *3 (E.D. Wis. July 24, 2008) ("[A] sentence that is disproportionately long in relation to the offense is unjust and likewise fails to promote respect [for the law]."); *Cf. United States v. Irey*, 612 F.3d 1160, 1239 (11th Cir. 2010) (Hill, J., concurring) (noting that "[u]nwarranted sentencing disparity breeds disrespect for the rule of law …"); *United States v. Stern*, 590 F. Supp.

2d 945, 957 (N.D. Ohio 2008) ("Respect for the law is promoted by punishments that are fair, however, not those that simply punish for punishment's sake."). Thus, in the careful application of the § 3553(a) factors here it is as imperative and pivotal to avoid any unnecessary excessive incarceration as it is in any other case which seeks to impose just punishment to promote respect for the law. An overly harsh sentence (as is requested by the Government) under circumstances such as in this matter, it is believed, would in fact promote disrespect for the law and the justice system. This case therefore warrants the full force of the judicial adage to guard against "no greater punishment than is reasonably necessary."

**E.     <u>Need for Adequate Deterrence</u>**

The empirical evidence is virtually unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. See Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates ... were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28- 29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) or even marginal deterrent effects. ... Three National Academy of Science panels, all appointed by Republican Presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48

Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame"). The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level …" "The guidelines' offense level is not intended or designed to predict recidivism." *U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, Measuring Recidivism"]. See also Part IV.A.3, *infra*. And according to "the best available evidence, … prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Should the Court believe contrawise, that is that sentences do equate to deterrence, it is submitted that a minimal sentence of incarceration followed by supervised release, is sufficient to accomplish that deterrence here. To be sure, Mr. Valentin fully understands the criminal nature of his conduct. Even a minimal sentence in this case clearly meets the needs for deterring his more than improvident conduct for which he takes full responsibility. Once released from any punishment imposed by this Court, and if serving on supervised release, this Defendant will remain fully aware that any further transgressions will immediately result in incarceration. This constitutes total deterrence. Continuing to warehouse the Defendant for a term as projected in the proposed Sentencing Guidelines calculation, and as calculated by the probation officer, or, indeed, as requested by the Government, is not required, and clearly would not be fairly tailored to meet the unique aspects of this case, or this Defendant.

A below guideline sentence is also sufficient to serve notice to others who commit, or are inclined to commit, similar offenses. The word, of course, has gone out, that the Justice Department has long arms that can reach back in time, and that four-year-old, January 6th transgressions will result in arrests, prosecutions and convictions. The public filing of the charges against Mr. Valentin, his plea of guilty, his conviction, his sentencing and his what will be economic losses suffered by his business, have served as evidence to the public of what may happen to those who violate the nation's federal law, even under the hopefully never-to-recur circumstances such as are presented here.

**F.**    **To Protect The Public From Further Crimes Of The Defendant**

The Defendant has never committed a crime prior to January 6, 2021 and has likewise never committed a crime in the four (4) years since January 6, 2021. There is no evidence that he would recidivate, and the Government hasn't suggested otherwise.

**G.**    **To Provide The Defendant With Needed Educational Or Vocational Training, Medical Care, Or Other Correctional Treatment In The Most Effective Manner**

The Defendant has several degrees and personal licenses and he actually mentors people in his vocation. He is not in need of medical care or treatment by the federal prison system.

**H.**    **The Requested Sentence Avoids Unwarranted Disparities**

This Court must also consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6).

Section 3553(a) provides, in pertinent part:

> The Court, in determining the particular sentence to be imposed, shall consider . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553 (a)(6)

On the fourth anniversary of the January 6, 2021, Capitol riot, there are more than 1,500 people across the United States who have been charged with federal crimes related to it. The sentences imposed in January 6th cases range from probation, community service, restitution, home detention and time, to many years of incarceration for the leaders of Oath Keepers and Proud Boys enthusiast groups who were convicted of seditions conspiracy for plots to use violence to stop the peaceful transfer of power from Donald Trump, a Republican, to Joe Biden, a Democrat.

More than 100 January 6th defendants are scheduled to stand trial in 2025, with at least 168 defendants set to be sentenced this year. "Hundreds of Capital Riot Prosecutions Are In Limbo As A Court Awaits Trump's White House Return", Alanna Durkin Richer and Michael Kunselman, Associated Press, January 5, 2025.

Matthew Valentin is among those scheduled to be sentenced this year. Having no prior record, and having engaged in conduct which neither caused injury nor destroyed property, and having never entered the Capitol or any other building on January 6, 2021; and having admitted to his wrongful conduct and, never having boasted about it on social media or other communication, the Defendant is hopeful that he will be sentenced with those similarly situated.

A cursory review of the link: https://www.justice.gov/usao-dc/capital-breach-cases, produces a number of cases where the defendant's 18 U.S.C. Section 111(a)(1) sentences produced terms of sentences that were only one year plus a day or less. See, e.g.

### SENTENCES IMPOSED IN CASES ARISING OUT OF THE EVENTS OF JANUARY 6, 2021[1]

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|
|  |  |  |  |  |

---

[1] It is believed that these Defendants, like Matthew Valentin, are a Criminal History Category I.

| Leffingwell, Mark | 1:21-CR-00005-ABJ | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | 6 months' incarceration 24 months' supervised release 200 hours' community service $2,000 |
| Council, Matthew | 1:21-CR-00207-TNM | 18 U.S.C. § 231(a)(3) 18 U.S.C. § 111(a)(1) 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) | 30 months' incarceration 36 months' supervised release $2,000 restitution | 60 months' probation 6 months' home detention 100 hours community $2,000 restitution |
| Young, Philip | 1:21-CR-00617-DLF | 18 U.S.C. § 111(a)(1) 18 U.S.C. § 231(a)(3) 18 U.S.C. § 1752(a)(2) 18 U.S.C. § 1752(a)(4) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(F) | 40 months' incarceration 36 months' supervised release $2,000 restitution | 8 months' incarceration 36 months' supervised release $2,000 restitution |
| McNamara, James | 1:23-CR-00119-ABJ | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 24 months' supervised release $2,000 restitution | 12 months' incarceration 24 months' supervised $2,000 restitution |
| Leyden, Joseph | 1:22-CR-00314-TNM | 18 U.S.C. § 111(a)(1) 18 U.S.C. § 1752(a)(2), (b)(1)(a) 18 U.S.C. § 1752(a)(4) (b)(1)(A) 40 U.S.C. § 5104(e)(2)(G) | 27 months' incarceration 36 months' supervised release | 6 months' incarceration 12 months' supervised |
| Lockwood, Michael | 1:23-CR-00146-RDM | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | 12 months' and 1 day incarceration 36 months' $2,000 restitution |
| Dillard, Kaleb | 1:23-CR-00049-JMC | 18 U.S.C. 111(a)(1) | 18 months' incarceration 36 months' supervised release $36,238 restitution | 10 months' incarceration 12 months' supervised $5,500 fine $36,238.55 restitution |
| Russell, Bobby | 1:23-CR-00029-APM | 18 U.S.C. §111(a)(1) | 30 months' incarceration 36 months' supervised release $2,000 restitution | 12 months' & 1 day 24 months' supervised 6 months' home detention 250 hours' community $2,000 fine |
| McNulty, Devin | 1:23-CR-00235-TSC | 18 U.S.C. § 111(a)(1) | 24 months' incarceration 36 months' supervised release $2,000 fine | 12 months and one day' incarceration 24 months' supervised release 60 hours' community service $2,000 |
| Camargo, Samuel | 1:21-CR-00070-ABJ | 18 U.S.C. § 111(a)(1) and 1752(a)(1) | 12 months' incarceration 12 months' supervised release $500 restitution | 6 months' incarceration (credit time served) 6 months supervised release $500 restitution |

Of particular interest to this Court may be the matter of *United States of America v. Luke Hoffman*, (D.D.C. 23-cr-329 (RDM). See, *Government's Sentencing Memorandum* (Doc. 27, 8/29/24). Although this case resulted in a significant 20-month sentence (rather than a sentence of one year and a day, or less, as cited above) its scenario is similar to the case sub judice, and it is the only case the defense could find where the Defendant plead guilty to two (2) counts of 11(a). It is submitted to this Court for review for that purpose.

At the time of sentencing, Mr. Hoffman was a 40-year-old owner of a maintenance services company. He pled guilty to two (2) counts of 18 U.S.C. Section 111(a)(1). His conduct consisted of 1) ripping a bike rack from the arms of law enforcement which they were utilizing for a perimeter and protection; 2) engaging an officer standing in a defensive posture by approaching and grabbing that officer's baton and attempting to rip it from his hands while shouting at him; and 3) spraying a canister of OC spray at an officer who had to duck out of the way of the spray. Mr. Hoffman also assisted another rioter by hoisting him on his shoulders while that individual used a wooden pole to attack officers. *Id.*

Mr. Hoffman had a criminal history category I, his guideline range was 46 to 57 months imprisonment (due in part to an agreed upon sentencing enhancement not present here), and the Government's recommended sentence was a middle of the guidelines range 51 months. *Id.* Mr. Hoffman received a sentence of 20 months incarceration.

Similar to Mr. Hoffman, Mr. Valentin is a young man who owns his own business, has no prior record, was in Washinton to protest the COVID restrictions, supports his family, expressed remorse for his action, and prior to this incident led an otherwise laudable and law-abiding life.

Unlike Mr. Hoffman, Mr. Valentin did not bring a weapon[2] or OC spray to Washington, nor did he strike an officer with the OC spray as Mr. Hoffman did. As stated, Mr. Valentin sprayed the chemical irritant into an area which did not impact any officer. Further, Mr. Valentin did not assist other rioters in assaulting law enforcement with dangerous weapons, nor did he brag on social media about his conduct, as Mr. Hoffman did. Also, Mr. Valentin's guideline range is 30-37 months, which is 16-20 months less than Mr. Hoffman's range was. Any sentence for Mr. Valentin that is not reasonably less than Mr. Hoffman's sentence would lead to a significant sentence disparity in this District, which is a factor that must be strongly considered by this Court.

Lastly, in the Government's Sentencing Memorandum they refer to three separate cases (from more than 1500 it has to choose from for January 6th) to argue that the Defendant's sentence should approximate that given to those hand selected defendants. Those defendants were sentenced to 40, 38 and 78 months, with the first using a metal bat to break into a Capitol conference room inside the Capitol building where he then physically assaulted an officer, the second "causing significant bodily injuries to one officer"; and the third, leading the crowd into the Upper west Terrace doorway after breaching in; striking multiple officers with his hands, locked arms with other rioters in defiance of commands by officers to leave; and anonymously launched a metal pole at officers trying to prevent rioters from entering the Capital through the tunnel entrance. This person had a lengthy criminal history and received 78 months of incarceration.

The Governments argument that the Defendant who never injured any officers (much less several or seriously injured them), who never entered into the Capitol building, who never led any group of rioters breaking into the Capitol building, and who has no prior criminal history, should

---

[2] Mr. Hoffman brought a knife to the Capitol.

received 38, 40 or 78 months sentence, evidences how excessive the Defendant's 30 to 37 guidelines proposed sentence actually is.

**VI.**    **The Government Openly Attempts To Have this Court Order An Upward Variance In Sentencing For This Defendant In Order to "Match" The Sentencing Range Of His Co-Defendant Brother, Something Which Has Been Rejected By This, And Other Circuits, And Should be Rejected Here**

The Government engages in overreach when it tries in its Sentencing Memorandum to justify the sentencing exposure to which it has subjected brother Andrew, by now seeking an upward variance for Defendant Matthew. The Government admits that it is seeking an upward variance to "account[ ] for the mismatch between Valentin's guidelines, his conduct, and is co-defendant's similarly situated conduct." Government's Sentencing Memorandum, p. 19 (Doc. 63).

The Defendant would point out that this Circuit has refused to permit Section 3553(a) to be used as a justification for manipulating the sentences of two or more defendants in the same case, based upon a claimed attempt to combat "disparity".

The United States Court of Appeals for the District of Columbia addressed the issue of sentence disparity between co-defendants in the same manner as a majority of Circuits that have faced this issue have, by declaring that the Guidelines attempt to eliminate sentencing disparity on a much broader scale, than among the defendants in a single case, and that disparity elimination will not be permitted to be used as a shortcut to justifying increased incarceration or punishment.

> The very purpose of the Guidelines, however, was to eliminate disparity in the sentences of similarly situated defendants. *United States v. Joyner*, 924 F.2d 454, 460 (2d Cir.1991). To isolate a single case and conclude that the Sentencing Guidelines inadequately consider sentencing disparity among several defendants is to lose sight of the forest for the trees. The Guidelines attempt to achieve uniform sentences across the nation not within a particular criminal transaction, and "[t]he greater uniformity trumps the lesser disparity." *United States v. Mejia*, 953 F.2d 461, 468 (9th Cir.1991). The nationwide uniformity at which the Guidelines aim is directed not just to the particular criminal conduct which codefendants may share, but also to factors like

criminal history and acceptance of responsibility which may well vary between codefendants.

*U.S. v. Williams*, 980 F.2d 1463, 1467, 299 U.S. App. D.C. 20, 24 (1992).

And consequently, it held that it would not permit the manipulation of sentences on that basis, simply "because of disparity in the sentences imposed on individuals involved in the same criminal transaction." *Id.* (internal citations avoided).

It should be noted that the Third Circuit, which was not mentioned by the Court in *Williams*, also has ruled that 18 U.S.C. Section 3353(a)(6) is <u>not</u> directed at disparity between co-defendants' sentences but, that the goal of subsection (a)(6) is to promote national uniformity rather than uniformity among co-defendants in the same case. *U.S. v. Parker*, 462 F.3d 273 (3d Cir. 2006).

Here, it is plain that the Government does not wish to vary downward to reduce brother Andrew's recommended sentencing range to have it match Defendant Matthew's range and so, it is, now, seeking to vary upward to have Defendant Matthew's range assimilate his brother's higher sentencing range. This is clearly inappropriate. If it is reasoned uniformity among similarly situated criminally accused actors that the Government really wants, it should grant brother Andrew, the same downward variance that Defendant Matthew justifiably seeks here. But, it cannot legally secure an upward variance in Matthew's punishment in the name of avoiding co-defendant sentencing disparity. And it cannot go without mention, the co-Defendant brothers do not face the same charges, and hence do not face the same guidelines range.

The Government tries to further justify their requested massive upward variance with additional overreach. The Defendant's acts were decidedly wrong, and admittedly warrant criminal sanctions, as evidenced by his guilty plea and sincere remorse. But, to call his acts, as the Government does in its Memorandum "unprecedented and uniquely harmful" among January 6 participants is simply incorrect. Matthew's right hand was positioned on a rung of a bike rack and his left hand and arm

went through the bars only momentarily, and Matthew immediately retrieved his left hand and arm in less than a second and regrasped the rung of the bike rack it was knocked off of. And, as to the baton in his hand, he never used the baton in any fashion, at any time to harm an officer.

Finally, the Government wants him to "account for the chemical irritant that he twice sprayed at officer." *Id., p.*19. The Government never charged Matthew in the First or Superseding Indictment because the Government was aware that: 1) they had no idea what the spray was; 2) the video doesn't show him discharging the spray at any officer; 3) and, no one, not an officer or anyone else, even claims that the spray came near them, much less injured them in some way. The Government's discovery in January 6th cases is full of spray victims who have testified or gave statements against those who actually sprayed them. But, not in this case because Matthew's momentary spray disbursed immediately. Matthew's spray was, as he conveyed in his interview, more of a symbolic gesture than anything else.

Again, all these acts were wrong, and Matthew has admitted his wrongdoing and has expressed his continued remorse for his actions, which he has never blamed on anyone else but himself. He has mentioned more than once how he is still haunted by his acts, daily. But he shouldn't be required to remain silent when his actions are being magnified as being "uniquely serious" amongst the totality of some of the horrific events that occurred on "January 6th." Nor should he have to silently endure the Government's argument that his actions are alleged to be "more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range". The Government's attempt to "match" the brothers' sentences is legally and factually insufficient.

## VII.      Fine And Restitution

Despite his hard work, having his business located in his home, and renting out an extra room in his home for $500.00 per month, the Defendant's finances, as demonstrated by the PSR, are still

insufficient, with Total Monthly Expense of $3,447.00 and a Total Monthly Cash Flow of only $2,886.00. PSR (Doc. 63) p. 20.

The Defendant maintains two bank accounts, one business and one personal. The business account contains monies which are customer funds designated as payments for HVAC equipment. The other, Credit Union account includes monies prepaid by customers for work to be performed and is not yet available for his personal use – and will not be if he is incarcerated. (Funds presently in the defendant's bank account appear to have prompted the probation officer to state that he" appears to be able to pay a normal fine in this case.")

In short, the Defendant is teetering on insolvency and has no present or prospective ability to pay a fine, especially if he is incarcerated as a one man operation, and, no fine should be imposed. Se, 18 U.S.C. Section 3572(a)(1) and U.S.S.F. Section 5E1.2(d).

The Defendant has agreed to pay $2,000.00 in restitution as his portion of the January 6th episode.

## VIII.    Sentencing Recommendation

The question for this Honorable Court is, of course, what sentence should be imposed in a case such as this one.    Granting a below Guidelines sentence which allows for minimal incarceration, does two things.  It gives the government a successful prosecution under the instant circumstances, which sends a message that any similar conduct will not go unpunished. At the same time, it recognizes the guidance provided by the Sentencing Guidelines and gives proper credit for the factors above, the circumstances of the offense, as well as the long-recognized adjustments permitted by the law.

Under the circumstances of this case, we respectfully request the Court to impose a non-guidelines sentence of minimal incarceration.  Such a sentence would meet the stated purposes of federal sentencing in this case and would recognize that the Defendant's exemplary life before and

following January 6th. Mr. Valentin has fully acknowledged his criminal transgressions and has fully cooperated with the Government.  He is ready to serve an appropriate punishment imposed by this Court, and then return to his family in need, and to the community of which he is an important part, to rebuild his life and to restore his dignity, and to continue to contribute to that larger community. The future of this Defendant is humbly presented to this Court for proper consideration.

It is respectfully requested that Mr. Valentin be given the downward variance as requested above. That proper adjustment would expose him to a just sentence, and one which would avoid any disparity with other defendants similarly situated.

<div style="margin-left: 40%">

Respectfully submitted:
KAROLY LAW FIRM, LLC

</div>

Dated: January 15, 2025                    BY:    /s/ Joshua E. Karoly, Esquire
Joshua E. Karoly, Esquire
PA I.D. No. 206076
527 Hamilton Street
Allentown, Pennsylvania 18101
(610) 437 – 1252
(610) 437 – 3738 (facsimile)
j.karoly@karolyfirm.com
Attorney for Defendant Matthew Valentin

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 1:24-cr-00178(RBW) |
| | : | |
| MATTHEW VALENTIN, | : | 18 U.S.C. §111(a)(1) |
| | : | **(Assaulting, Resisting, or Impeding** |
| Defendants. | : | **Certain Officers)** |

### CERTIFICATE OF SERVICE

I, Joshua E. Karoly, Esquire, do hereby certify that a true and correct copy of the foregoing *Defendant Matthew Valentin's Memorandum in Aid of Sentencing,* was served upon the following individual in the manner and at the address indicated below:

**Via ECF**
Anna Krasinski, Esquire
53 Pleasant Street
Suite 4th Floor
Concord, NH 03301
anna.krasinski@usdoj.gov

Respectfully Submitted:
KAROLY LAW FIRM, LLC

Dated: January 15, 2025                BY:    /s/ Joshua E. Karoly
Joshua E. Karoly, Esquire
Pa. I.D. No. 206076
527 West Hamilton Street
Allentown, PA 18101
(610) 437 – 1252
(610) 437 – 3738 (facsimile)
Attorney for Defendant Matthew Valentin